NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

SUZANNE ESTER DELESKEY,

    **Plaintiff,**

-vs-             Case No. 6:10-CV-309-ORL-31KRS

COMMISSIONER OF SOCIAL SECURITY,

    **Defendant.**

_____


### REPORT AND RECOMMENDATION

**To the United States District Court**

  This cause came on for consideration without oral argument on the Complaint filed by Suzanne Ester Deleskey, seeking review of the final decision of the Commissioner of Social Security denying her claim for social security benefits.  Doc. No. 1.  The Commissioner answered the Complaint and filed a certified copy of the record before the Social Security Administration (SSA).  Doc. Nos. 10, 12, 18.

**I. PROCEDURAL  HISTORY.**

  In 2007, Deleskey applied for disability benefits under the Federal Old Age, Survivors and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq.*, and under the Supplemental Security Income for the Aged, Blind and Disabled Program

(SSI)[1], 42 U.S.C. § 1381, *et seq.* (sometimes referred to herein as the Act).  R. 139-41, 151-53.  She alleged in the OASDI application that she became disabled on January 23, 2007, and in the SSI application that she became disabled on June 26, 2007.  R. 139, 151.  Deleskey's applications were denied initially and on reconsideration. R. 81-82, 87, 93-94.

Deleskey requested a hearing before an administrative law judge (ALJ).  R. 103-04.  An ALJ held a hearing on June 17, 2009.  Deleskey, represented by an attorney, testified at the hearing.  V. David Pigue, a vocational expert (VE), also testified.  R. 23-80.

After considering the testimony and the medical evidence presented, the ALJ determined that Deleskey was insured under OASDI through December 31, 2012.  R. 12. The ALJ found that Deleskey had not engaged in substantial gainful activity since January 23, 2007, the alleged onset date of her disability.  R. 12.

The ALJ concluded that the medical evidence showed that Deleskey had chronic obstructive pulmonary disease (COPD) and right knee degenerative joint disease, which were severe.  These impairments did not meet or equal any of the impairments listed in the applicable social security regulations (the Listings).  R. 12-14.

---

[1] The ALJ noted that the SSI claim was denied due to "income and resource reasons."  R. 10 n.1.

The ALJ found that Deleskey had the residual functional capacity (RFC) to perform sedentary work,[2] except that in an 8-hour day, she could sit for 6 hours and stand for 2 hours with a sit/stand option.  She could lift 10 pounds occasionally and frequently, occasionally climb, balance, stoop and crouch but could not kneel or crawl. She could occasionally be exposed to heat, cold and vibration but must avoid exposure to heights, hazards or pulmonary irritants.  R. 14.

In reaching this conclusion, the ALJ found Deleskey's testimony about the limitations arising from her impairments was not totally credible.  R. 15-19.

Because Deleskey's past relevant work required more than a sedentary level of exertion, the ALJ concluded that Deleskey could not return to her past relevant work.  R. 19-20.  Relying on the testimony of the VE, and considering the Medical-Vocational Guidelines (the Grids), 20 C.F.R. Pt. 404, Subpt P, App. 2, the ALJ concluded that Deleskey could work in clerk/receptionist positions or similar types of jobs that were available in the national economy.  R. 20-21.  Therefore, the ALJ concluded that Deleskey was not disabled.  R. 21.

Deleskey requested review of the ALJ's decision.  R. 5.  In support of her request, Deleskey submitted additional evidence.  She submitted pages from the Physician's Desk Reference (PDR) and copies of her prescriptions which indicated the possible side

---

[2] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a); 20 C.F.R. § 416.967(b).

effects from her medications.  Doc. No. 18-2 at 8-27; R. 590-609).  Deleskey also

submitted a questionnaire from Samuel Miller, M.D., in which Dr. Miller opined that

Deleskey was unable to be on her feet (standing or walking) for a total of 2 or more hours

in an 8-hour day 5 days per week due to knee pain and shortness of breath secondary to

chronic obstructive pulmonary disease (COPD).  Doc. No. 18-2 at 28; R. 610).  Dr. Miller

indicated that she should take frequent breaks as needed to recline or lie down during an

8-hour day, had side effects from her medication which would prevent her from

concentrating for 2 hours at a time, and was unable to perform any activity 8 hours per

day 5 days per week on a reliable and sustainable basis due to COPD.  *Id.*  Dr. Miller

opined that these conditions had existed since January of 2007.  *Id.*

The Appeals Council considered the additional evidence Deleskey presented.  It

issued a decision finding no basis to review the ALJ's decision.  R. 1-4, Doc. No. 18-2 at

2-5; R.  584-87).  Deleskey timely sought review of this decision by this Court.  Doc. No.

1.

## II.	JURISDICTION.

Plaintiff having exhausted her administrative remedies, the Court has jurisdiction

to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g), as adopted

by reference in 42 U.S.C. § 1383(c)(3).

## III.    STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI or SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3),1382c(a)(3)(D).  In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979) (per curiam).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits.  In sum, an ALJ must apply the following criteria, in sequence:

(1)    Is the claimant presently unemployed?

(2)    Is the claimant's impairment severe?

(3)    Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part     404, Subpart P, Appendix 1?

(4)    Is the claimant unable to perform his or her former occupation?

(5)    Is the claimant unable to perform any other work within the  economy?

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to a finding of "not disabled."  *See, e.g.*, *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits."  *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).  However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform."  *Id.* at 1278 n. 2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210.  "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982) (internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam) (citing *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983)).  Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210.  The court may not reweigh the evidence or substitute its own judgment. *Id.*

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988) (per curiam).  Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law.  *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

## IV.   STATEMENT OF FACTS.

After a thorough review of the record, I find that the pertinent facts are generally adequately presented in the opinion of the ALJ and the parties' memoranda.  Therefore, I will only summarize the evidence to protect Deleskey's privacy to the extent possible.

*A.   Testimony.*

Deleskey was born in 1957.  R. 26.  She received a high school diploma and an associate degree in graphic design.  R. 27.  The last day she worked was in January of 2007.  R. 27-28.  She inspected and packed metal products and worked in shipping and receiving.  Prior to that job, she was a manager and maintenance person at an apartment complex.  Prior to that, she worked for a mobile home supply business where she stocked supplies, waited on customers and loaded and unloaded trucks.  R. 33. Before that job, she worked in the deli and bakery at a grocery store.  R. 34-35.  She worked at a grocery store for 4 ½ years.  R. 37.  She had also worked another job as a clerk in accounts receivable and fixed copy machines.  R. 59.

After she was laid off in January of 2007, she worked at Big Lots for 2 weeks stocking shelves 10 hours per week.  R. 38, 53.  She was terminated because she could not lift, kneel or perform the job requirements.  R. 38, 53.  She had applied for several jobs, including an inventory associate at a grocery store, an account specialist at a college, a merchandiser for Pro Logic, a hotel, and online with Yahoo.  R. 38-39.

She had surgery on her right knee in January of 2007, and had knee problems since then.  She had no strength and her right knee constantly gave out on her and was unstable.  R. 40.  Her knee was painful all the time and her back bothered her when she

NOT FOR PUBLICATION

sat.  R. 45-46.  She could sit for an hour before she had to stand and could stand for an hour.  She could not walk for 5 minutes.  R. 46.  She could lift 10 pounds.  R. 47.

If it was humid, she had a difficult time breathing.  R. 41.  She saw Dr. Desai once or twice for her breathing problems.  R. 41.  She testified that she currently saw Dr. Samuel Miller for her breathing problems.  R. 42.

Her doctors treated her with Albuterol and Ipratropium which she put in a nebulizer.  She used these medications at least twice a day and more often sometimes. R. 43.  She used Advair and an Atrovent inhaler.  R. 43.  When her breathing troubles flared up, she had a prescription for Prednisone.  R. 43.  She was still smoking but was hoping to quit.  R. 44.  She did not smoke some days.  R. 44.

She did dishes, laundry, swept, and did grocery shopping and cooking.  She did not do yardwork.  R. 47.  She went to church and occasionally visited friends.  R. 48. She still smoked but had cut back on the amount.  R. 38.  She had quit smoking for one week.  R. 37.

A couple of times per week she became fatigued and would lie down to rest for an hour or two.  If she was nervous, her chest would become tight but she did not have pain. R. 51.  She would also become short of breath when her chest was tight.  R. 52. Occasionally, she suffered from asthma.  R. 52.

She was treated for depression approximately 10 years before the ALJ's hearing, and she took Paxil for anxiety attacks.  R. 49.  She did not treat with a psychiatrist or psychologist.  R. 49.  She drank alcohol on the weekends, although she used to drink

NOT FOR PUBLICATION

everyday.  R. 49-50.  She stopped drinking everyday about a month before the hearing.
She had been drinking 2 to 4 beers per day.  R. 50.

She had good days and bad days.  On bad days, a couple of times per month, she
did not want to do anything or see anybody.  She dressed herself everyday.  R. 54.  She
bathed a couple of times per week.  Sometimes she would not leave the house for a day
or two at a time.  R. 55.  On those days, she did not have any ambition to go outside.  R.
56.

In a disability report, Deleskey reported various side effects from some of her
medication.  Albuterol and Atrovent caused dizziness.  R. 164.  Atrovent also made her
chest feel tight and sometimes made her sick to her stomach and jittery.  R. 168.  Her
Albuterol inhaler also caused shakiness.  R. 199.  Darvocet helped her pain but made her
nauseous and sleepy.  Welbutrin made her lethargic and uninterested in anything but did
keep her calm and help her anxiousness.  R. 168, 199.  She sometimes got an upset
stomach from Ibuprofen.  R. 215.

A note from Deleskey's representative dated February 22, 2008 indicated that
Deleskey stopped taking Wellbutrin at the end of 2007 and that no doctor would see her
currently.  R. 205.  She was not taking any other psychotherapeutic medications.  R. 205.
She had not seen any doctors since September 1, 2007 because her insurance ran out.

NOT FOR PUBLICATION

B.      *Vocational Expert Testimony.*

The ALJ posed the following hypothetical questions to the VE:

I've got four hypotheticals here for you.  Three of them are just a takeoff of the first one.  The first one is 20 pounds occasionally, ten pounds frequently, sit six, stand six, occasional climb, balance, stoop, no kneel, and no crawl, occasional crouch.  So it's occasional climb, balance, stoop and crouch, no kneeling, no crawl, no heights, no hazards, and no pulmonary irritants, occasional cold, occasional heat, occasional vibration.  The second one is the same as the first one with a sit/stand option.  The third hypo, ten pounds occasionally, ten frequently, sit six, stand two –

* * *

And everything else is the same as the first hypo.  And hypothetical number four is identical to hypothetical number three, with a sit/stand option.  Okay.  First question, would the hypothetical individual set forth in the first hypothetical be able to engage in any of the Claimant's past work?

R. 70-71.

Based on this hypothetical question, the VE opined that the hypothetical claimant would be able to perform a range of light work, which would include Deleskey's past jobs of deli cutter/slicer, manager of apartments, the inspector/packager as well as the administrative clerk position.  The VE noted that the jobs of apartment house manager and the administrative clerk job would allow for a sit/stand option.  The VE stated that under the third hypothetical, the person could not perform Deleskey's past work because the third hypothetical described a sedentary position.  R. 71.  With the sedentary restrictions, a person could perform the jobs of information clerk, DOT No. 237.367-022, receptionist, DOT No. 237.367-038, and order clerk, DOT No. 249.362-029.  R. 74-75.  All three of these positions would allow for a sit/stand option.  R. 75.

C.     *Medical Records.*

Karen Gaynair, M.D., treated Deleskey on January 10, 2005.  Deleskey reported injuring her back many years before.  She took Tylenol for constant pain in her back. She had normal range of motion and stood and lifted a lot at work.  R. 578.  She took Prevacid and Zyrtec daily.  R. 578.  She reported smoking one pack per day for 20 years. She drank a couple of beers per day.  R. 579.  She was prescribed the Clonodine patch weekly for hypertension.  R. 579.  She was diagnosed with nicotine dependence and offered nicotine replacement products which she refused.  R. 579.

On January 18, 2005, Deleskey reported having trouble filling her prescriptions because they were expensive and she was no longer covered with Florida Health Care. R. 572.  Her hypertension had resolved and her back pain only occurred occasionally. She was counseled to quit drinking.  R. 570.

Deleskey treated with William Geers, M.D., on January 10, 2006.  She had no complaints.  Stacey Pappas, M.D., saw Deleskey on March 3, 2006.  Deleskey complained of episodes where she felt her throat was closing and could not breathe. She felt as if she was wheezing, then either vomited or had sneezing attacks and then felt better.  R. 563.  A rhinolaryngoscopy was performed.  R. 563-64.

Deleskey was treated at Halifax Medical Center on September 24, 2006 for an acute right knee strain.  R. 303.  She was walking her 90-pound dog and he ran into her knee.  R. 304.  She was given an immobilizer and prescribed Ultracet.  R. 304.  She was released to return to work in a couple of days.  R. 303, 307.

NOT FOR PUBLICATION

She saw Dr. Geers on October 5, 2006, and complained of right knee pain.  R. 561.  She had returned to work but it was difficult.  He opined that she could have a possible meniscal tear on the medial side of the right knee.  R. 562.  She stated that Lortab helped her pain but she could not take it at work.  R. 562.  He prescribed Naprosyn double strength and recommended an MRI.  He advised her to ice her knee at least 15 minutes twice a day.  R. 562.

Dr. Geers reviewed the MRI results with Deleskey on October 12, 2006.  The MRI showed a grade 2-3 medial collateral ligament tear and a ganglion cyst at the posterior lateral femoral condyle.  She said her knee had improved slightly and her swelling had decreased.  She was still in pain but she did not fill the prescription for Naprosyn because she was afraid to take it at work.  R. 559.  He told her Naprosyn was not a narcotic and was safe to take at work.  She continued to take Lortab at night.  He wrote her a note for work that she should be on light duty.  She was referred to an orthopaedic surgeon.  R. 560.

On October 26, 2006, Deleskey treated with Srinivasa Sridhar, M.D.  A prior MRI had shown Grade II to III medial collateral ligament tear and a prominent ganglion cyst.  She had mild swelling in her knee and no instability in flexion or extension.  She lacked the last few degrees of extension.  Dr. Sridhar recommended ice and exercises.  R. 266.

On December 6, 2006, Deleskey treated with George D. Telesh, M.D.  She complained of pain and instability recently.  Her knee was tender to touch but she had good extension.  Dr. Telesh ordered a repeat MRI.  R. 265.  An x-ray of her right knee on December 6, 2006 was unremarkable.  R. 272.  An MRI of her right knee on December

NOT FOR PUBLICATION

22, 2006 showed no change from the prior study.  R. 271.  Deleskey treated again with

Dr. Telesh on January 9, 2007 and complained of continuing kneepain and instability.

She had considerable tenderness in her knee with decreased motion.  R. 264.  He

recommended arthroscopy.  R. 264.

Dr. Telesh performed the arthroscopy on January 24, 2007.  R. 251-2, 281, 315-

16.  His post-arthroscopy diagnosis was arthrofibrosis and suprapatellar plica of the right

knee.  R. 281, 315, 319-20.  After her surgery, Deleskey was "doing fine" and walking on

crutches.  R. 263.  He prescribed Keflex and Percocet.  She was unable to work.  R. 263.

On February 2, 2007, Deleskey had her sutures removed.  She still had redness

and swelling.  R. 262.  She had not filled the prescription for the antibiotic as instructed.

R. 262.  She saw Dr. Telesh again on February 5, 2007 and complained of pain and

blisters on her right knee as well as discoloration.  Dr. Telesh noted her knee was puffy

and she had an increased temperature.  Deleskey was taking her antibiotic, Keflex.  R.

261.  Testing revealed that her knee was not infected.  R. 258.

On February 16, 2007, Deleskey was "doing somewhat better" but had pain which

sometimes woke her up at night.  Deleskey had peeling of her skin with blisters.  She

was prescribed Ketoprofen to decrease the inflamation in her knee.  She was sent to

physical therapy.  Dr. Telesh indicated she probably could not return to work for at least a

month.  R. 259.  On March 9, 2007, Dr. Telesh noted Deleskey was improving.  She still

had pain but was going to therapy.  Her knee was discolored and sensitive to touch.  She

was able to do a quad set and had relatively good strength.  He diagnosed a delayed

recovery of her knee secondary to various collagen and dermatologic reactions.  Dr.

NOT FOR PUBLICATION

Telesh stated she did not have an infection.  She was advised to continue therapy and not to work for one month.  She was advised to stop smoking, which Dr. Telesh stated was part of her problem with healing.  R. 258.

On April 5, 2007, Dr. Telesh noted Deleskey had been going to therapy but her knee still hurt and was tender.  He noted her rash had healed up somewhat although there was still discoloration of the skin and keloid formations.  She had decreased sensation over one portion of her knee.  Her quadricep muscle was contracted and weak. She could not flex her knee past 120 degrees.  He diagnosed cutaneous neuritis, dermatitis and quadriceps contracture and weakness in her right thigh.  Dr. Telesh stated that Deleskey was a very heavy smoker and he thought that was why she was not recovering well.  He referred her to pain management to see if they could desensitize her skin.  She was taken off work for a month.  R. 257.

Deleskey's physical therapy records indicated little progress, and her discharge summary indicated she walked with a severe antalgic gait pattern and showed severe decreased quadricep and hamstring strength.  R. 287-93.  She was noted to have limitations on squatting and walking.  She had reached her maximum potential.  R. 287.

On April 19, 2007, Deleskey treated with Yousef W. Guergues, M.D., for pain management.  R. 285-86.  She reported pain on and off in her right knee which sometimes reached a level of nine out of ten.  She smoked ½ to 1 pack of cigarettes everyday and drank 6 packs of beer everyday.  Examination showed severe tenderness over the joint line of the right knee, no swelling, no limitation of range of motion, and some skin discoloration over the knee.  R. 285.  Dr. Guergues diagnosed myofascial pain

syndrome and tear of the medial collateral ligament and prescribed Darvocet N100 every six hours as needed.  R. 286.

Dr. Telesh saw Deleskey again on May 3, 2007.  Deleskey said she was "coming along," and was going to therapy.  Her pain improved and occasionally her knee did not hurt at all.  She had trouble and pain bending the knee.  Her swelling had resolved and her sensation had returned and she was not tender.  Dr. Telesh stated again that her slow healing was due to her heavy smoking.  He suggested a smoking cessation clinic but she did not want to go.  Dr. Telesh opined that Deleskey was not healing because of nicotine's effect on her small blood vessels.  He took her off work for another month but stated she should stop smoking which would be "a number one remedy for an increase in her healing process."  R. 256.

Deleskey complained to Dr. Guergues of increased pain on May 17, 2007.  Dr. Guergues scheduled her for a series of nerve blocks and renewed her prescription for Darvocet N100 for pain.  R. 284.  On May 21, 2007, Dr. Guergues performed nerve blocks in her knee.  R. 283.

Dr. Geers treated Deleskey on June 26, 2007.  Pulmonary function testing showed severe obstruction and she was counseled to stop smoking.  She had Atrovent and Albuterol at home which she may not have been taking appropriately.  She had not filled a prior prescription for Zyban to stop smoking because she thought she had tried it before and was not able to use it.  She was also counseled about drinking too much. She stated she was stressed after she stopped working and had been drinking up to 12 beers a day.  She was about to go back to work again and thought she would reduce the

NOT FOR PUBLICATION

amount she was drinking then.  R. 550.  His diagnosis was COPD and he referred her to a pulmonologist.  He also told her it was imperative that she stop smoking immediately and to stop drinking completely for at least 4 to 6 months to allow the liver to repair itself. R. 551.

Deleskey treated with Suresh D. Desai, M.D., for shortness of breath on July 16, 2007.  She had a minimal cough and her breathing was aggravated by increased humidity and exertion.  Her effort tolerance was one city block.  R. 323.  She reported smoking up to 2 packs per day for the past 20 years and she continued to smoke.  She denied any history of alcohol abuse but drank 6 to 8 beers per day.  She took Prilosec and an Atrovent inhaler a couple of times a day and Albuterol as needed.  R. 324. Pulmonary function testing showed a FEV1/FEV ration of 0.46 with a predicted 0.8.  Dr. Desai ordered a chest x-ray and emphasized that she needed to stop smoking.  R. 325.

On June 7, 2007, Deleskey complained she was still having knee pain.  Her knee did not feel right and she developed some instability.  Pain management did not help much.  R. 255.  Her knee was tender to touch but her knee moved well and she had fair strength against resistance, although it was painful.  The skin had healed up to some degree but there was still discoloration and a leather-like condition to her skin.  Dr. Telesh stated he had never seen a knee or tissue react so violently to the arthroscopy with skin discoloration, blisters, neuritis, and a total tissue revolt against the surgery.  He again attributed a significant amount of her problems with healing to smoking, which she continued.  He doubted that her knee could ever return to hard labor.  She was taken off work for another month.  R. 255.

NOT FOR PUBLICATION

On July 10, 2007, Deleskey reported feeling better and moving well.  She did not ache as much and was "really not taking any pain pills."  R. 253.  Her right knee was still discolored and sensitivity to touch was decreased.  Her collateral and cruciate ligaments were stable. *Id.*

Spirometry testing performed on July 31, 2007 revealed a moderately severe obstructive lung defect with no significant response to an acutely inhaled bronchodilator.  R. 296.  Dr. Desai treated Deleskey again on August 20, 2007 and stated that she had bilateral upper lobe hyperinflatation.  R. 322, 334.  Dr. Desai told Deleskey that she would benefit from using Spiriva but she said she would not buy it because of the expense.  She was going to discontinue her Atrovent because she lost her insurance.  He was going to put her on Prednisone and repeat her testing to see if she improved.  Deleskey told Dr. Desai she was not going to do this.  R. 322.

On November 5, 2007, Carlos M. Sanchez, M.D., evaluated Deleskey.  R. 336-38.  She stated she was unable to work because of extreme fatigue with any type of exertion.  She got light-headed and became tired walking to her mailbox.  She had lost her insurance and had problems affording her medications.  R. 336.  She reported difficulty with her knee as well.  Her current medications included Atrovent, Albuterol, Prevacid, Allegra, Wellbutrin, Prednisone, Spiriva, Nasalide and Darvocet.  R. 336.  Deleskey stated she smoked six cigarettes a day for thirty years.  She drank alcohol socially.  R. 336.  She walked with a slight limp.  He diagnosed COPD, fatigue, shortness of breath and right knee pain.  R. 338.

On February 28, 2008, Deleskey presented to the emergency room, complaining of chest pain for 4 days.  She stated she was a ½ pack per day smoker.  She admitted drinking six beers daily.  R. 365-66.  She was given Atrovent.  R. 367.  Matthew Kocisko, M.D., recommended 23-hour observation in the chest pain center.  Deleskey refused and signed out against medical advice.  R. 368.

Deleskey again presented to the emergency room on March 12, 2008, complaining of shortness of breath.  R. 376, 397-98.  At the time, she was taking Mucinex, Wellbutrin XL, Allegra, Atrovent, Prevacid and Albuterol.  R. 397.  She described some mild headaches and dizziness.  She stated she smoked 1 to 2 packs per day for over 30 years and continued to smoke.  R. 399.  Her shortness of breath increased upon exertion.  R. 377.  She was diagnosed with obstructive chronic bronchitis with acute exacerbation.  Secondary diagnoses included: chest pain, hypertension, esophageal reflux, hypopotassemia, tachycardia, abnormal liver function study, alcohol abuse and tobacco use disorder.  R. 376.  After testing, the attending doctor noted she may be having alcohol withdrawal which caused a tachycardia.  A cardiac catheterization was completed and her coronary arteries were normal.  R. 377, 405-06, 492-96, 534-43.  Spriometry testing revealed moderate obstructive disease and moderate loss in lung diffusion capacity.  R. 430.  She was counseled about her use of alcohol.  She was prescribed Valium, Norvasc, Levaquin, Advair, Medrol Dose-Pak and Wellbutrin XL.  R. 377.

On April 15, 2008, J. Jeff Oatley, Ph.D., performed a psychological evaluation on Deleskey.  R. 432.  Deleskey reported having COPD and being forgetful, which kept her

from completing tasks.  R. 432.  She reported she could not afford many of her

medications.  R. 433.  He noted her energy level was normal although she reported tiring

easily.  R. 433.  Her gait was balanced.  R. 433.  She was mildly short of breath walking

into the office from the parking lot.  R. 433.  He diagnosed a nicotine dependence and an

adjustment disorder with anxiety and depressed mood, chronic, as indicated by crying for

the past year since being out of work and being nervous regarding financial problems.  R.

434.  He noted she prepared meals, went shopping, drove a car, could bathe and dress

herself and performed many household chores including laundry.  R. 434.  She had

friends who came and visited her on a regular basis and enjoyed her new puppy and

crossword puzzles.  She reported difficulty completing routine housework due to

shortness of breath and knee pain.  R. 434.

On April 21, 2008, Deleskey returned to Halifax Hospital for evaluation of her

COPD.  R. 544.  She continued to smoke but was trying to quit.  R. 544.  She reported

taking Allegra, Atrovent and Albuterol as well as Mucinex.  V. John D'Souza, M.D.,

reported she was anxious.  R. 544.  He diagnosed her with COPD with emphysema,

nicotine dependency and weight loss.  R. 544.

Deleskey was admitted to the hospital on November 28, 2008 and discharged on

December 1, 2008.  She presented with an exacerbation of her COPD.  Her discharge

diagnosis was obstructive chronic bronchitis with exacerbation.  R. 487.  She was

provided with Ativan for anxiety as needed.  She was also given Prednisone and

nebulizers.  Zithromax was prescribed.  R. 488.

NOT FOR PUBLICATION

Deleskey was admitted to the hospital again on February 25, 2009 and was discharged on March 2, 2009.  R. 546.  She complained of 5 days of shortness of breath.  She stated she had been out of all her medications for 1 or 2 months.  R. 548.  She was worried about a heart attack due to anxiety.  R. 548.  Her medications included Advair, Atrovent, Albuterol and Prevacid.  R. 549.  Her diagnosis at discharge was COPD exacerbation, improved; sore throat; electrolyte abnormality; tobacco abuse; and alcohol abuse.  R. 546.

    D.    *Reviewing Professionals.*

Reuben Brigety, M.D., completed a Physical Residual Functional Capacity Assessment on November 30, 2007.  He stated that Deleskey could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk and sit about 6 hours in an 8-hour workday, and that she was limited in pushing and/or pulling in her lower extremities.  R. 356.  She was limited to occasionally climbing, balancing, stooping, kneeling, crouching and crawling.  R. 357.  She should avoid concentrated exposure to fumes, odors, gases and poor ventilation as well as hazards such as machinery and heights.  R. 359.  He noted her symptoms were credible.  R. 360.

Steven Wise, Psy.D., completed a Psychiatric Review Technique form on March 24, 2008.  R. 378.  He indicated she did not have any restrictions and had no mental deficits.  R. 378-90.  Dr. Wise completed another Psychiatric Review Technique form on April 18, 2008.  She had affective and anxiety related adjustment disorders, mixed.  R. 438, 440.  He opined she had mild restrictions on activities of daily living, difficulties in

maintaining social functioning and difficulties in maintaining concentration, persistence or pace.  R. 445.

Edward DeMiranda, M.D., completed a Physical Residual Functional Capacity Assessment on May 21, 2008.  He stated that Deleskey could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk and sit about 6 hours in an 8-hour workday with unlimited pushing and/or pulling.  R. 450.  She was limited to frequently balancing, stooping, crouching and crawling, occasionally climbing ramp/stairs and kneeling, and never climbing ladder/rope/scaffolds.  R. 451.  She should avoid concentrated exposure to extreme cold and heat, vibration, fumes, odors, dusts, gases, poor ventilation and hazards, including machinery and heights.  R. 453.

## V.    ANALYSIS.

Deleskey asserts two grounds supporting reversal.  First, Deleskey asserts that the ALJ failed to consider and elicit testimony regarding side effects of her medication.  Second, she contends that the Appeals Council failed adequately to consider the additional evidence she submitted and explain why it did not find the evidence new and material.  These are the only issues I will address.

### A.    Medication Side Effects.

Deleskey contends that the record shows that her medications caused dizziness, drowsiness, lethargy, sleepiness, nausea, anxiousness, tightness in her chest, an upset stomach and jitteriness.  R. 51, 164, 168, 195, 199.  She asserts that the ALJ erred by failing to elicit testimony regarding these side effects and incorporate the limitations from side effects in his RFC finding.

As noted above, Deleskey indicated in written disability reports that some medications caused dizziness, nausea, shakiness, headaches, sleepiness and lethargy. During the ALJ's hearing, Deleskey testified that she was fatigued, but she did not attribute the fatigue to a side effect of medication.  R. 51.  Moreover, the medical records do not reflect consistent complaints of side effects of medication.  For instance, she complained of extreme fatigue and being light headed and tired to Dr. Sanchez, but did not attribute these feelings to her medications.  R. 336.  Similarly, on March 12, 2008, she complained of mild headaches and dizziness but did not attribute these symptoms to her medications.  R. 548.

Although "the ALJ has a basic duty to develop a full and fair record, the claimant 'bears the burden of proving that he is disabled and consequently, he is responsible for producing evidence in support of his claim.'"  *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003)(citing 20 C.F.R. §§ 416.912(a), 416.912(c)).  "[T]he ALJ need not inquire into the side effects of a claimant's medications where the claimant was represented at the hearing, and did not assert that side effects from her medications contributed to her disability."  *Vesy v. Astrue*, 353 F. App'x 219, 224 (11th Cir. 2009) (citing *Cherry v. Heckler*, 760 F.2d 1186, 1191 n.7 (11th Cir. 1985)).  Deleskey, who was represented by counsel at the hearing before the ALJ, did not testify that any of her medications caused side effects which affected her ability to work or caused her disability.  Accordingly, the ALJ did not err by failing to soliciting testimony about side effects of medication because Deleskey did not assert at the hearing that any side effects from her medications contributed to her disability.

NOT FOR PUBLICATION

The ALJ's failure to address side effects of medication in his decision, if error, is harmless.  The record is replete with evidence that Deleskey did not take medication as prescribed and did not fill prescriptions.  In June of 2007, Dr. Geers noted that Deleskey was not using her Atrovent or Albuterol appropriately.  R. 550.  In July of 2007, Deleskey reported she was "really not taking any pain pills."  R. 253.  In August of 2007, she told Dr. Desai she was going to discontinue Atrovent because she had lost her insurance.  R. 322.  In November of 2007, she told Dr. Sanchez that she had lost her insurance and had problems affording her medications.  R. 336.   As of February 25, 2009, Deleskey indicated she had been out of all her medications for 1 to 2 months.  R. 548.

In light of the record as a whole, there is not substantial evidence supporting Deleskey's argument that side effects of medication limited her ability to work beyond the limitations included by the ALJ in his RFC finding.  Under these circumstances, the ALJ's failure to address side effects of medication is harmless.

B.    Appeals Council.

Deleskey argues that the Appeals Council failed to investigate and discuss new information Deleskey presented to it, specifically pages from the Physicians Desk Reference, sheets from the pharmacy on which Deleskey that showed possible side-effects of medication, and an opinion from Dr. Samuel Miller.  "[W]hen a claimant properly presents new evidence to the Appeals Council, a reviewing court must consider whether that new evidence renders the denial of benefits erroneous."  *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1262 (11th Cir. 2007).

The Appeals Council stated in its order: "[W]e considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council."  Doc. No. 18-2 at 2.  R. 584).  The Order of Appeals Council listed the new evidence, including medication descriptions and Dr. Miller's report.  Doc. No. 18-2 at 5.  R. 587).

Pursuant to *Ingram*, I have carefully reviewed the entire record and I find that this new evidence does not render the ALJ's denial of benefits erroneous.  While the PDR and medication descriptions show possible side effects of medication, as discussed above the record does not support Deleskey's contention that she experienced side effects of medication that limited her ability to work.

The opinion from Dr. Miller, whom Deleskey describes as a treating doctor, indicated that Deleskey was unable to stand or walk 2 hours in an 8-hour day due to knee pain and shortness of breath secondary to COPD, needed frequent hourly breaks due to shortness of breath secondary to COPD, and was unable to perform any activity 8 hours per day 5 days a week on a reliable and sustained basis due to COPD.  R. 18-2 at 28.  Dr. Miller opined that her medication side effects would prevent her from concentrating even 2 hours at a time and opined that her impairments and limitations had existed since she stopped working in January of 2007.  *Id.*

The note from Dr. Miller was simply a checklist of questions provided to him.  *Id.* He did not provide any diagnosis or clinical support for his opinions.  There are no treatment notes or other records from Dr. Miller in the record.  Even accepting Deleskey's representation that Dr. Miller was a treating physician, his summary conclusions are not

entitled to weight because they are conclusory not bolstered by evidence.  *See Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004) (citing *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)).

Under these circumstances, the Appeals Council's finding that the information submitted on appeal was not material is supported by substantial evidence.  Therefore, this assignment of error is unavailing.

**VI.    RECOMMENDATION.**

For the reasons set forth herein, I respectfully recommend that the decision of the Commissioner be **AFFIRMED**.  I further recommend that the Clerk of Court be directed to issue a judgment consistent with this Order and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on June 2, 2011.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Presiding District Judge
Counsel of Record